UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID W. DAVIS,

    Plaintiff,

CASE NO. 1:10-CV-167

v.

HON. ROBERT J. JONKER

AMERICAN BROADCASTING
COMPANIES, INC., a Delaware Corporation,
and TOUCHSTONE TELEVISION
PRODUCTIONS, LLC, d/b/a/ ABC STUDIOS,
a Delaware Limited Liability Company, and
BUENA VISTA HOME ENTERTAINMENT,
INC., d/b/a WALT DISNEY STUDIOS HOME
ENTERTAINMENT, a Florida Corporation,

    Defendants.

_____/

**OPINION**

    Mr. Davis wrote two action-mystery books about a modern-day warrior and protector named Ely Stone. ABC had a twenty-six-episode, comedy-drama series about an attorney named Eli Stone. Mr. Davis sued ABC for copyright infringement, claiming that the television series infringed his copyrighted works. Any similarities between Mr. Davis's novels and ABC's television series, however, are either unprotectible stock themes and *scenes a faire* or minimal and incidental. Additionally, the works are completely different in their overall feel and expressive elements like themes, characters, plots, sequences, pace and settings. As a matter of law, ABC's series is not substantially similar to Mr. Davis's works. The Court therefore grants ABC's motion to dismiss Mr. Davis's claims.

# BACKGROUND

David W. Davis, the plaintiff in this action, is an author who writes under the pseudonym David Walks-As-Bear. He authored two novels about a character named Ely Stone, "The Murmurings" and "Old Money." Mr. Davis sued three defendants in this action that are related to a television series called "Eli Stone" that was produced after Mr. Davis wrote his novels. Touchstone Television Productions, LLC, which does business as ABC Studios, developed and produced the Eli Stone television show. American Broadcasting Companies Inc. licensed the show from Touchstone for broadcast on the ABC television network. And Buena Vista Home Entertainment, Inc, which does business as Walt Disney Studios Home Entertainment, sells DVDs of the "Eli Stone" series under an agreement with Touchstone.

I.  Mr. Davis's Ely Stone Books

"The Murmurings" and "Old Money" are action, spy, mystery stories about the adventures of a Native American named Ely Stone. Ely is a retired member of the Coast Guard's elite "Trojan Horse Team," a specialized defense-intelligence group like the A Team or a movie version of MI6. Ely is a cagey and deadly fighter and a folksy sort of sleuth with a great deal of hard-won experience. He is a reluctant hero, but he is willing and able to put his James Bond skills to use for the sake of his tribe and loved ones.

Ely is a member of the Pukaskwa Black River Band Tribe of American Indians. He grew up in Michigan's Upper Peninsula, where the Tribe resides. In "The Murmurings," Ely has just returned to his childhood home at the time the Tribe plans to develop its interest in Muskrat Island. The Tribe intends to turn the island, which is in Lake Michigan, into an exclusive casino. Amos Reddeer, the Tribe's shaman, believes the island is possessed by something evil. Amos believes that Ely is a

"Pathfinder" who will protect his people and "troubleshoot and guide the way." He convinces the tribe to enlist Ely to investigate and monitor the island before the tribe goes forward with developing the casino.

Amos believes that Ely is a particularly good protector for the Tribe because he has a strong moral compass, he has experience with violent situations, he is willing and able to kill the bad guys, and he has the "shinkakee." The shinkakee is something like Spidey sense. When Ely is in immediate danger, particularly from a source of which he is not yet aware, he feels the shinkakee: a sense of extreme unease that alerts him to the danger. Usually he hears in his head a popular song with lyrics that express concern or foreboding as part of his shinkakee. In "The Murmurings," for example, he usually hears either "Ghost Riders in the Sky" by Johnny Cash[1] or "Something's Happening Here" by Buffalo Springfield.[2] Ely's shinkakee acts like an early warning system and gives him an uncanny ability to survive deadly situations, which earned him the nickname "Ghost" from his military comrades. Ely also is plagued by nightmares that are flashbacks of his worst

---

[1] One verse of this song states:

As the riders loped on by him he heard one call his name
If you want to save your soul from Hell a-riding on our range
Then cowboy change your ways today or with us you will ride
Trying to catch the Devil's herd, across these endless skies.

[2] The main verse of this song states:

There's something happening here
What it is ain't exactly clear
There's a man with a gun over there
Telling me I got to beware
I think it's time we stop, children, what's that sound
Everybody look what's going down.

experiences as an operative, some of which, upon waking, give him insight into how to handle the tasks ahead of him.

The basic story in "The Murmurings" revolves around a power source left by aliens on Muskrat Island in the 1950s. In the present day, several governments and independent spys or operatives are attempting to seize the alien artifact. The main action of the book focuses on Ely killing off Chinese super agents who have been physically modified to look Caucasian, avoiding being killed by the United States Air Force's super secret operatives, attempting to figure out why everyone is interested in the island with the help of a former Russian spy, and trying to reach a resolution that protects his Tribe's interests. Side stories include Ely's developing romance with another member of his tribe, Nettie, and his potential romance with the daughter of a former Russian agent who is after the alien device. At the end of the book, Ely has figured out what the object is, eliminated the foreign threats, delivered the alien artifact to the United States government, and gotten the government to give property in Hawaii to the Tribe in exchange for Muskrat Island.

"Old Money" is the second Ely Stone book. In it, Ely goes to Hawaii to examine the property he acquired for the Tribe. The story revolves around a treasure hidden in Hawaii in the past that was known to Ely's ancestor. The treasure can be discovered in the present with the help of a secret manuscript penned by Mark Twain. Terrorists, the mafia, the FBI, the Secret Service, and Ely are all after the treasure. Again, Ely kills a lot of bad guys and works with the United States' government to sort out the issues. One of the side plots involves Ely's sexual encounter with a doctor named Maggie, who he later runs into on Hawaii while she is attending a medical conference.

In "Old Money," Ely's spiritual awareness and connection to the earth again help him resolve the conflicts in the book. As in "The Murmurings," Ely has meaningful dreams. These dreams,

however, are not vivid recollections of his own past actions, but flashbacks to the life of his ancestor who knew about the treasure. The dreams give him insight into the location and nature of the treasure, as seen through the eyes of his ancestor. Additionally, because of his spiritual connection to the Earth, Ely is aided in his search by the Hawaiian equivalent of English Brownies: small, fey creatures who help people navigate and find things. He also retains the aid of the shinkakee.

II.     Defendants' Eli Stone Television Show

The ABC television series "Eli Stone" aired over 26 episodes between January 2008 and July 2009. In the show, Eli is an eighth-year associate at a prestigious San Francisco law firm that represents only vicious corporate clients. He is a particularly heartless and successful attorney who is expected to take over the firm in the future. The central plot of the first season revolves around Eli's hallucinations, which he experiences for the first time in the first episode and thereafter regularly experiences. The dramatic tension stems from the question of whether the hallucinations are prophetic visions or merely the symptoms of his brain aneurism. The hallucinations engulf his senses and make him look to everyone around him as though he has lost his connection to reality. In one episode, for example, Eli sees a plane strafing him and ducks for cover. Everyone else around him in the board meeting, however, merely sees him shouting and diving under the conference table. In later episodes, Eli learns to suspect that the things he is seeing are merely visions, not reality, but he cannot be sure while he is immersed in the visions and always responds as if they are real.

Eli's visions propel him to take pro bono cases and fight for the weak, which devastates his work life. Eli's brother, a doctor, as well as most of his work associates, think Eli needs to remove the aneurism and go back to normal. Acupuncturist Dr. Chen believes Eli may be a prophet and helps him decipher his visions. He also encourages Eli to see the visions as an opportunity to do

5

good in the world.  In the earlier episodes, Eli fights following the path that the visions urge on him, but the work makes him feel good and the visions help him sort out old angst related to his crazy, alcoholic father.  In later episodes, Eli embraces his potential as a crusader for helping the downtrodden and actively seeks to use his visions to benefit others.

Each episode focuses on the interplay between Eli's visions and his legal practice or, later in the series, his personal life.  In nearly every episode Eli has one or more immersive visions, seeks guidance from Dr. Chen, determines that the hallucination is calling upon him to take on a certain client or cause for moral rather than financial reasons, and acts accordingly.  The visions, although confusing, usually provide the road map for Eli's success.  For example, the pilot revolves around "Faith," a George Michael song.  Eli's hallucinations begin with mere auditory hallucinations of strains of the song.  In later visions, he sees George Michael performing the song, and he sings and dances along, even when at the office or in bed with his fiancee.  In that episode, Eli is representing a vaccine manufacturer in a products-liability trial against an autistic child.  He realizes that the plaintiff's mother is a girl he had sex with in college while the song "Faith" played in the background.  He visits her, and her child spells out "George Michael" in blocks.  Eli then takes her case and makes a moving closing argument, using the theme of having faith to win a jury award of millions. Many of the early visions and episodes are intertwined with a popular song, but most of the later episodes drop the connection between music and vision.  When music is connected with a vision, it is almost always humorous and in the Vaudeville or musical theater tradition:  out of nowhere, coworkers or people on the street leap into song and dance that directs Eli to his next legal or personal solution.

In addition to the legal cases, there are sub-plots that primarily involve Eli's love life, his health, and his relationships with his brother and dead father. For example, Eli breaks up with his fiancee, Taylor, as a result of the stress that the aneurism and visions place on him. His other connections include an old flame who needs his legal help, a young associate named Maggie who helps him with his pro bono work, a socialite, and a girl his dead father placed in his path. His visions sometimes hint to him how he can protect these people. The visions also help him make peace with the hurt inflicted by his dead father, an alcoholic who predominately ruined Eli's and his brother's childhood. Eli learns that his father also was plagued by visions and struggled to handle the pressure associated with them, and he discovers a notebook authored by his father that is meant to help guide him. Eli's experiences help him and his brother relive their youth and forgive their father.

## Discussion

I.     Legal Principles

By statute, the holder of a copyright is granted certain exclusive entitlements, including the right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(1). Mr. Davis alleges two causes of action: copyright infringement (Count I) and contributory copyright infringement (Count II). Both claims require Mr. Davis to establish two things: (1) that he owns the copyrighted creation, and (2) that the Defendants copied it. *See NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 816 (6th Cir. 2008); *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003). To establish the second prong, copying, the plaintiff must produce either direct evidence of copying or an inference of copying. *See Kohus*, 328 F.3d at 853-54. "[A] plaintiff may establish an inference of copying by showing (1) access to the allegedly-infringed work by the defendant(s) and (2) a

substantial similarity between the two works at issue." *Id.* at 854 (internal quotation marks omitted). For the purposes of this motion, Defendants are not disputing that Mr. Davis owns the copyright to his books or that Defendants had access to the works. Accordingly, the sole issue is whether the works are substantially similar. *See id.*; *see also Wickham v. Knoxville Int'l Energy Exposition*, 739 F.2d 1094, 1097 (6th Cir. 1984) (holding that proof of access is irrelevant if there is no substantial similarity).

The Sixth Circuit applies a two-step approach to determining substantial similarity. The first step is to filter out the unprotectible elements. *Kohus*, 328 F.3d at 855. Copyright protection extends only to the original components of a work, those elements that were created independently by the author and that possess some minimal degree of creativity. *Id.* Courts must exclude as unprotectible any elements of a work that are not original because "copyright protection extends only to expression of ideas and not to ideas themselves." *Stromback v. New Line Cinema*, 384 F.3d 283, 296 (6th Cir. 2004); *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea . . . concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated or embodied in such work."). The listings in a phone book, for example, have been held not to be original and were omitted from copyright consideration. *See id.* By contrast, the selection of listings and the arrangement of them has been held to be original work that is subject to copyright protection. *See id.* Additionally, "[c]ommon themes and ideas throughout literature" are not protected because they are not original components. *Stromback*, 384 F.3d at 296. Courts must also filter out *scenes a faire*, which are those elements that follow naturally from the work's theme rather than from the author's creativity. *Id.* "For example, parties, alcohol, co-eds, and wild behavior are natural elements in a story about a college

fraternity." *Id.* "Similarly, 'elements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about . . . policemen in the South Bronx,' and therefore are not afforded copyright protection." *Id.* (quotation omitted).

Once the unprotectible elements have been filtered out, the second step is to determine whether the allegedly infringing work is, from the perspective of the ordinary reasonable person, substantially similar to the protectible elements of the Mr. Davis's work. *Kohus*, 328 F.3d at 855; *Stromback*, 384 F.3d at 297. In performing this analysis, it is appropriate to review the "themes, characters, plot, sequence, pace and setting for similarities." *Id.* "'Random similarities scattered throughout the works' may be discounted." *Stromback*, 384 F.3d at 297; *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 320 (6th Cir. 2004).

Under Rule 12(b)(6), the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007). A court must accept as true all factual allegations, but it need not accept legal conclusions. *See Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949 (2009). "Only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950. A district court may determine on a motion to dismiss whether the copyrighted works and the allegedly infringing works are substantially similar, and it may dismiss the action if they are not. *See, e.g.*, *Nelson v. PRN Prods., Inc.*, 873 F.2d 1141, 1143-44 (8th Cir. 1989) (holding that a district court may determine as a matter of law whether two works before it are substantially similar if reasonable minds could not differ on the issue).

The Court may consider the works without converting the motion to one for summary judgment, even if the plaintiff did not attach the copyrighted works to his complaint, if the complaint refers to the document, the document is central to the claims, and the defendant provides the Court with an authentic copy. *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999)). In this copyright case, the complaint refers to the works, the works are central to the copyright claims, and the Defendants attached the works as exhibits to their Rule 12(b)(6) motion. Accordingly, the Court may consider them as part of the pleadings. *See id.*; *see also Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 788 (S.D. Tex. 2009); *House of Bryant Publ'ns, LLC v. A & E Television Networks*, No. 3:09-0502, 2009 WL 3673055 (M.D. Tenn. Oct. 30, 2009). Additionally the Court may consider matters subject to judicial notice pursuant to Federal Rule of Evidence 201, including the generic elements of creative works. *See, e.g.*, *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1128-29 (C.D. Cal. 2007); *see also* Fed. R. Evidence 201 (permitting a court to take judicial notice of facts that are "(1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

II.     Analysis

Mr. Davis fails to state a claim because his novels and Defendants' Eli Stone show are not substantially similar. As shown by the above discussion of the works, the books and the show are fundamentally different in all material respects. *See Kohus*, 328 F.3d at 855; *Stromback*, 384 F.3d at 297. There is no overlap between the original components of the works, which bear no substantial similarity to each other in the sequences of events, mood, dialogue, characters, plot, pace, setting, and themes. *See Stromback*, 384 F.3d at 297; *Murray Hill Publ'ns, Inc.*, 361 F.3d at 320. Indeed,

the concept, feel and expression in the works are entirely different. *See Kohus*, 328 F.3d at 855; *Stromback*, 384 F.3d at 297. Here, the Court may determine as a matter of law that Mr. Davis's books and the Eli Stone series are not substantially similar because reasonable minds could not differ on the issue. *See Nelson*, 873 F.2d at 1143-44.

Despite the total difference of expression in the works, Mr. Davis contends that several protected elements are present in both his works and the television series that require this Court to deny Defendants' motion to dismiss. Most of these alleged similarities must be filtered out from the consideration of substantial similarity because they are stock themes and characters, or *scenes a faire*, and therefore unprotectible. Other alleged similarities between the works do not exist at all, but are merely Mr. Davis's erroneous characterizations of the works themselves. The similarities that do exist are similar only at the generic level and only with regard to unprotectible elements. Such superficial similarities are insufficient to establish substantial similarity. *See Stromback*, 384 F.3d at 297. Moreover, the few similarities are randomly disbursed throughout the works and therefore are insufficient to establish copyright violation. *See id.*; *Murray Hill Publ'ns, Inc.*, 361 F.3d at 320; *see also Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) (holding that lists of similarities are not particularly useful for determining substantial similarity because "they are inherently subjective and unreliable," especially where "the list emphasizes random similarities scattered throughout the works").

Although courts have cautioned against considering lists of similarities between works to determine whether the works are substantially similar because such lists "are inherently subjective and unreliable" and tend to "emphasize[] random similarities scattered throughout the works," such a list is valuable here because it serves to demonstrate the dearth of similarities, even random and

scattered similarities, between the works at issue here. Accordingly, the Court will address in turn all of the claimed similarities between the works.

A. Visions

Mr. Davis characterizes both Eli and Ely as having visions, and he contends that Defendants thereby violated his copyright. A character who has visions is not copyrightable because visions are not original components of a work–that is, visions are an idea, not an element that could be created independently by the author. *See Kohus*, 328 F.3d at 855.

Moreover, in terms of original expressive elements–that is, the elements of the work with the author's stamp–the "visions" the protagonists experience are completely different. *See Kohus*, 328 F.3d at 855; *Stromback*, 384 F.3d at 297. Television Eli is overwhelmed by immersive visions that engage completely all of his senses. Sometimes Eli seems to recognize that the vision is not reality, but it so completely dominates his senses that he cannot be sure. Moreover, he is always swept up by the vision, even when he is suspicious of its reality. These visions describe the future, even if cryptically. Some of Eli's visions involve music in a way much like musical theater, with people singing and dancing in a way that provides a guidepost for the action he should take. The music leavens the situation and keys the viewer into the fact that Eli is experiencing a vision, not reality. In the early shows, he genuinely believes the music must have a normal source. In later shows, many of his visions–although still visually immersive–do not involve music at all. By contrast, the Ely of Mr. Davis's books has something like Spidey sense and, occasionally, dreams that relive his memories or the life of an ancestor. Ely's Spidey sense is not visual; it is a feeling of foreboding that, often, is accompanied by an audio hallucination of a pop song that also expresses foreboding. It engages, at most, his auditory sense. Additionally, it is predictive, but it only predicts immediate

12

danger; it is merely an audio track triggered by a threat. And Ely always knows the song is playing in his head, even when he wishes there were a more normal explanation for it. His dreams are visual, but they are not hallucinations or visions in the sense that they predict the future. Instead, they are Ely's tortured memories or a flashback into the past life of an ancestor, and they do not overwhelm him in his waking life.

Assuming that both character's experiences can be called visions, there are a handful of similarities between the visions. For both Eli and Ely, the visions indicate that they must take action and sometimes involve music in some capacity. Additionally, each character has a vision in which he sees a historical war and one in which he sees Hawaii. These similarities, however, exist only at the most generic and unprotectible level. Indeed, the concept of a hero who sees visions and uses them to help people is unoriginal and unprotected because it is a "[c]ommon theme[] and idea[] throughout literature." *Stromback*, 384 F.3d at 296. Seers and prophets for the people appear as far back as the Old Testament and have been repeated in countless works since, from ancient Greece and Rome (Laocoon and Cassandra) to modern cinema and television (Field of Dreams, It's A Wonderful Life, Joan of Arcadia, and Saving Grace). The fact that the vision is audible and involves music also is not an original idea. Apollo's myths, for example, described the connection between music and prophesy. Similarly, in the Bible, 2 Kings 3:14-19, the prophet Elisha called for a musician and, while the musician was playing, the hand of the Lord came upon him and he spoke a prophesy. Nor is the fact that other people do not hear or see the vision an original element. These follow naturally from the unprotectible idea of a character having visions or auditory hallucinations and are unprotected *scenes a faire*. *See Randolph*, 634 F. Supp. 2d at 788-89 ("[Plaintiff] argues that in both the book and the movie, most of the action occurs in imaginary realms created and controlled

13

by the thoughts and dreams of a person in the real world. . . . As this court noted, 'the general concept of an imaginary world or realm . . . cannot be copyrighted.'"); *see also Williams*, 84 F.3d at 589. Similarly, the fact that the seer does what he sees in the vision is not original. That, indeed, follows naturally from having prophetic visions.

Additionally, each character has a vision in which he sees a historical war and one in which he sees Hawaii. As actualized in the individual works, however, these similarities exist only at the most generic and unprotectible level. In the show, Eli's visions of war and Hawaii do not reflect actual events, but provide a road map to solving his problems. In the books, Ely's "visions" are actually flashbacks to the past life of his ancestor, who fought in a war and was actually on the island of Hawaii. In terms of expressive elements, the similarities are merely random, not substantial. *See Kohus*, 328 F.3d at 855; *Stromback*, 384 F.3d at 297.

B.  Reluctant Hero

Mr. Davis characterizes both Eli and Ely as being reluctant heroes, and he contends that this makes Defendants' work a violation of his copyright. It is true that both protagonists are reluctant heros who do not believe, at least initially, they are chosen or a prophet. They also both, at least initially, do not want their gifts and shrug off or reject their calling to help other people. This, too, is merely an idea, not an original element of the works that is subject to copyright protection. *See Kohus*, 328 F.3d at 855. It is a "[c]ommon theme[] and idea[] throughout literature," particularly heroic genres. *Stromback*, 384 F.3d at 296. Precisely this reluctance drives many hero stories. Spiderman, Batman and Superman are a prime examples of reluctant heros. So are Luke Skywalker, the Hobbits, and Buffy the Vampire Slayer. Mere reluctance to take up the mantle of greatness cannot be grounds for copyright infringement. *See id.*

14

C. Spiritual Advisors

Mr. Davis contends that the television show violates his copyright because both works include spiritual advisors to the protagonist. In each work, the guide (1) helps the protagonist interpret and understand his visions and powers, (2) tells him that what is happening to him is God's way of guiding him to do what is right, (3) tells him that he is to be a leader for the people, and (4) occasionally appears to the protagonist in his dreams or visions.

Like the reluctant hero trope described above, merely having a spiritual advisor to a hero with supernatural powers is not a copyright violation. *See id.* The fact that the seer has a spiritual guide who helps him interpret his visions follows naturally from the idea of having visions. *See id.* Similarly, the fact that the advisor tells the protagonist he is important and should use his powers for good is not original. As actualized in the works, the spiritual advisors are no more similar to each other than they are to Yoda, Headmaster Dumbledore, Obi-Wan or Gandalf. Having an advisor whose purpose is to provide advice or act as a moral compass is a *scene a faire* to the spirit-hero genre that "follow[s] naturally from the work's theme, rather than from the author's creativity." *Kohus*, 328 F.3d at 856.

D. Love Interests

Mr. Davis points to several alleged similarities between the works that relate to love interests of the protagonist. None of the similarities are both protected elements and substantially similar. For example, both characters are worried about emotionally hurting, or being hurt by, their love interest. This emotional drama is the primary concern in both works. Ely is worried Nettie will hate him for being a killer, Eli is worried that his love will be devastated if he died suddenly as a result of his aneurism. This is unoriginal in the copyright sense: Having a love interest and being

15

concerned about her is a basic idea to human existence. *See id.* Moreover, the characters in each work have very different concerns. In addition to the emotional component, Ely Stone of the books is worried that Nettie might get physically hurt because he is in a dangerous line of work. He is not worried he would, himself, physically harm her. Eli of the show, by contrast, knows that his father accidentally shot a gun during a vision, so he is concerned that him might accidentally physically harm someone during the course of a vision. The actual expression in the works is not substantially similar. *See Kohus*, 328 F.3d at 855; *Stromback*, 384 F.3d at 297.

Both protagonists are romantically interested in a woman named Maggie, but in this example, too, the works are not substantially similar. The Maggies are completely different: Eli's Maggie is his colleague in legal practice, but Ely's Maggie is a woman he helps as a favor to her father, a former Russian spy. Additionally, the mere fact that they share the same name cannot be the basis for copyright infringement. *See, e.g.*, *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 435 (S.D.N.Y. 2002).

Similarly, in each work, the protagonist develops a passing romantic interest in a woman he has used his powers to help, specifically by helping her sick child. The hero having an attraction to someone he helps, however, is a stock theme that is not original and possesses no minimal degree of creativity. Additionally, the women, the children, and the form of help are completely different. In one, the woman is the daughter of a Russian spy, her child has a rare form of cancer that requires expensive treatment, and Ely pays for the treatment. In the other, the woman is a former flame, her child has autism, and Eli sues the manufacturer of the product that caused the child's autism. Finally, the sick child and mother are undeveloped, minor characters in Mr. Davis's works, and thus they are not protected. *See Murray Hill*, 361 F.3d at 319 ("It follows that the less developed the

characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.").

Both protagonists also have a colleague who is interested in one of their love interests. A love triangle, however, is not an original element for copyright purposes. *See Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) ("One cannot copyright the idea . . . of love triangles among young professionals that eventually become strained."); *Davis v. United Artists, Inc.*, 547 F. Supp. 722, 726 (S.D.N.Y. 1982) (holding that although both works have love triangles in which the betrayed member of the triangle commits suicide, this is an unprotectible idea and concept).

E. Side Characters and Names

Finally, Mr. Davis's work and Defendants' show both involve characters with similar names. The main characters in the works, for example, are named Eli and Ely. A name, however, generally is an unprotectible generic element of a work. *See, e.g.*, *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 435 (S.D.N.Y. 2002) ("Aside from the similar, though not identical, names of the main characters and the fact that both 'Larry' and 'Harry' are boys with glasses, [defendant's] booklet and Mr. Davis's books . . . have almost nothing in common."); *see also Hogan v. DC Comics*, 48 F. Supp. 2d 298, 311 (S.D.N.Y. 1999) (holding that the works were not substantially similar despite both having a protagonist named Nicholas Gaunt who was half-vampire and half-human).

Additionally, each work contains a character named Stanley who is connected to Hawaii. In one episode of the television show, it is discovered that a trial witness named Stanley was paid by a lawyer to abscond to Hawaii in order to be unavailable for trial. In the book "Old Money," Stanley goes to Hawaii to find money to pay off a mob debt. These events are not similar in terms of their actual expression, which makes them insufficient to establish substantial similarity. *Murray*

*Hill*, 361 F.3d at 325 ("[E]ach of these similarities is tenuous. At the level of actual expression they differ significantly. . . . Where, as here, the slight similarities are not thematically related, the whole is no greater than the sum of its parts."); *Stromback*, 384 F.3d at 283.

Finally, each work contains a secondary character named Ramerez or Ramirez who is connected to airplanes. This, too, however, is at best a superficial and trivial similarity. In the Ely books, Mr. Ramerez is a member of the United States Air Force who is assigned to watch Ely in a few brief scenes. In the Eli show, Mr. Ramirez is an illegal immigrant and client of Eli's whose wife was injured by the chemicals he sprays as a crop duster. These characters are not substantially similar. *See Murray Hill*, 361 F.3d at 320, 325; *Stromback*, 384 F.3d at 283.

**Conclusion**

Mr. Davis's works and Defendants' television series are not substantially similar. The books and the show are completely different in almost every imaginable way, including the sequences of events, mood, dialogue, characters, plot, pace, setting, and themes. There is no overlap between the original components of the works, and any similarities between them are either unprotectible or not substantial. Reasonable minds could not differ on this issue. Accordingly, the Court grants Defendants' motion to dismiss (docket no. 10).


Dated:     July 28, 2010                    /s/ Robert J. Jonker
                                            ROBERT J. JONKER
                                            UNITED STATES DISTRICT JUDGE